IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BERENICE VEGA OSTOS,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. **3:14-CV-3935-L** |
| | § | |
| **JOSE ALFREDO VEGA,** | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the Petition for Return of Child to Petitioner ("Petition") (Doc. 1), filed by Petitioner Berenice Vega Ostos[1] ("Ms. Vega Ostos" or "Petitioner") on November 6, 2014. The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure[2] following a bench trial held on March 9 and 10, 2015, at which Petitioner and Respondent Jose Alfredo Vega ("Mr. Vega" or "Respondent") were represented by counsel. For the reasons that follow, the court **grants** the Petition for Return of Child to Petitioner and **orders** that the child, J.G.V., be **returned** forthwith to Mexico to the custody of his mother, Petitioner Berenice Vega Ostos.

---

[1] In its February 11, 2015 memorandum opinion and order denying Respondent's Motion to Dismiss, the court inadvertently misspelled Petitioner's first name as "Bernice."

[2] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *See id.* The court instead has limited its discussion to those legal and factual issues that form the bases of its decision. *Id.*

**Memorandum Opinion and Order - Page 1**

## I.      Procedural Background

This case involves the alleged wrongful removal or retention of a child under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc., No. 99-11, which is implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003 *et seq*.  Petitioner brought this action on November 6, 2014, requesting that the court order the return of her eight-year old child J.G.V. to his "habitual residence" of Mexico.  In her Petition, Ms. Vega Ostos contends that Respondent, her former husband, wrongfully removed  J.G.V. from Mexico to the United States in July 2014 or retained the child after his July 2014 summer visitation in violation of her custodial rights under Mexican law and the custody agreement contained in the parties' Final Decree of Divorce ("Divorce Decree") entered on November 8, 2012, by the 302nd Judicial District Court, Dallas County, Texas.  Ms. Vega Ostos seeks an order requiring Mr. Vega to immediately return J.G.V. to Mexico.  Ms. Vega Ostos also seeks to recover her attorney's fees and costs incurred as a result of this action. According to Ms. Vega Ostos, the parties' Divorce Decree gives her the exclusive right to designate J.G.V.'s primary residence without regard to geographic location; J.G.V. was a habitual resident in Mexico since shortly after his birth until his wrongful removal from Mexico or retention by Mr. Vega; and she was exercising her custodial rights at the time of the wrongful removal or retention.

On December 30, 2014, Mr. Vega moved to dismiss the action, contending that this is not a case of a parent crossing the border in search of a more sympathetic forum and does not involve the abduction of a child but instead involves an ongoing dispute between two managing conservators concerning the well-being of their child.  In his motion, Mr. Vega asserted that he has lived in Dallas

County, Texas, for several years and has never hidden from Ms. Vega Ostos the whereabouts of J.G.V., who is currently residing with him and attending school in Dallas County, Texas.  Mr. Vega therefore argued that this action does not fall under the ICARA and instead merely involves the issue of whether a modification of the parties' custody agreement should be granted by the 302nd Judicial District Court, Dallas County, Texas, which entered the parties' Divorce Decree.  Mr. Vega asserted that he filed a motion with the state court to modify the parties' parent-child relationship as to J.G.V. on August 12, 2014.  According to Mr. Vega, the 302nd Judicial District Court has "continuing, exclusive jurisdiction" over J.G.V.'s welfare and best interests.  Mr. Vega therefore contended that Ms. Vega Ostos should have sought to enforce her parental rights under the Divorce Decree in the 302nd Judicial District Court, rather than federal court, and he requested that the court defer to the proceeding pending in the 302nd Judicial District Court on his motion to modify the parties' parent-child relationship as to J.G.V.

Mr. Vega further asserted that, even assuming that the ICARA applies, Ms. Vega Ostos cannot establish the requisite prima facie case under the ICARA because: (1) J.G.V. is not a habitual resident of Mexico; and (2) he is not in breach of any custody or court order.  According to Mr. Vega, he is a joint managing conservator under the Divorce Decree and, as such, has the right to ensure that J.G.V. is not placed in harm's way.  In addition, Mr. Vega contended that he has affirmative defenses under Article 13 of the Convention that would allow J.G.V. to remain in his custody in the United States.  In this regard, Mr. Vega contended that returning J.G.V. to Mexico would subject him to a grave risk of physical or psychological harm or otherwise place J.G.V. in an intolerable situation.  Mr. Vega also objected to J.G.V returning to Mexico on the grounds that J.G.V. has reached an age and level of maturity appropriate for the court to take into account his

view as to whether he should be returned to Mexico.  Mr. Vega therefore requested that the Petition filed by Ms. Vega Ostos be denied and dismissed.  Mr. Vega also seeks to recover attorney's fees and costs of suit.

On February 11, 2015, the court denied the motion to dismiss and set the case for trial but permitted Mr. Vega to retain custody of the child pending resolution of this case.  In denying the motion to dismiss, the court concluded that Ms. Vega Ostos had alleged sufficient facts to state a claim for wrongful removal or retention and return under the Convention and advised the parties that the facts supporting Ms. Vega Ostos's claim for wrongful removal and Mr. Vega's affirmative defenses under the Convention would need to be developed in an evidentiary hearing.  The court, therefore, set the case for trial and directed Mr. Vega to file an answer to the Petition that included any defenses he may have to Ms. Vega Ostos's claim for wrongful removal or retention and return under the Convention.

On February 23, 2015, Respondent filed his Answer in which he denied the allegations in the Petition.  In his Answer, Respondent contends that Petitioner cannot establish a prima facie case necessary to prevail and asserts affirmative defenses under articles 12, 13, and 20 of the Convention. With respect to Petitioner's prima facie case, Respondent contends that Petitioner was not exercising her custody rights when Respondent brought J.G.V. to the United States; that Petitioner consented or acquiesced to J.G.V. moving to the United States; that Respondent has an affirmative duty under the parties' custody agreement to protect J.G.V. from harm and, therefore, was not in breach of any court order when he brought J.G.V. to the United States; and that J.G.V.'s habitual residence is Dallas County, Texas, not Mexico.

In support of his affirmative defenses, Respondent contends in his pretrial memorandum as follows:

> In July 2014, Mr. Vega traveled to Mexico during his summer visitation rights under the Final Divorce Decree. Mr. Vega learned that his son was physically and emotionally abused under the care of the Petitioner. Mr. Vega also learned that JGV was used in illegal criminal activities by the Petitioner and/or her boyfriend/husband and was made to travel in bullet proof cars and [] to travel seventeen (17) hours to the U.S. border and drop off car(s) and then fly back home. Mr. Vega further learned that his son was being locked in the bathroom for up to thirty (30) days as a "punishment" and was allowed to come out only for eating meals, to sleep at night and to go to school. While in Mexico, JGV, Petitioner and Petitioner's boyfriend/husband were kidnap[]ed and held for ransom for two days while in the care of Petitioner and the boyfriend.

Resp't's Pretrial Br. 3. Respondent further asserts that "on or about August 12, 2014, [he] filed a Modification of a Parent-Child Relationship in the 302nd Judicial District Court, Dallas County, in accordance with the Texas Family Code, which is pending at this time." *Id.* Respondent continues to maintain that the ICARA does not apply because the custody dispute between him and Petitioner is between two managing conservators. On the other hand, Respondent maintains that Petitioner is "barred [from] possessive or join[t] managing conservatorship to [J.G.V.]" because Petitioner's new husband is involved in illegal activity and modification of the parties' custody agreement "is necessary to protect [J.G.V.] from child neglect and/or abuse." Resp't's Answer 4-5.

On March 9 and 10, 2015, the court conducted a bench trial regarding Ms. Vega Ostos's Petition under the Convention for the return of J.G.V. and Mr. Vega's affirmative defenses to the Petition. The court heard testimony from Ms. Vega Ostos, Mr. Vega, and Marisol Garcia (Ms. Garcia"). The court also conducted an in camera interview of J.G.V. with the assistance of a Spanish-speaking interpreter.

In addition to witness testimony, the parties presented documentary evidence and arguments during the bench trial through their counsel and filed pretrial briefs in support of their respective positions.  The court preadmitted Petitioner's Exhibit Nos. 2, 3, 5, 8 and Respondent's Exhibit Nos. 1 through 4.[3]  During the course of the trial, the court also admitted Petitioner's Exhibit Nos. 4, 6, 12, 14, 15, and 18, and Respondent's Exhibit No. 5.  Petitioner's Exhibit No. 1 was initially admitted for the limited purpose of showing that Petitioner submitted an application to the Mexican Central Authority to start the process of getting J.G.V. returned to Mexico.  During the course of the trial, however, Petitioner sought to have Exhibit No. 1 admitted beyond the previously agreed upon limited purpose, and the court admitted the exhibit subject to Respondent's objection.  The court sustained Respondent's objections to Petitioner's Exhibit Nos. 19 and 20 and denied Petitioner's request to admit these exhibits into evidence.  All other exhibits of Petitioner (11, 13, 16, 17) were admitted subject to Respondent's objections, which the court took under advisement.  For objections to exhibits or other evidence that were taken under advisement, the court explained to the parties that, if the evidence is discussed in the court's findings of fact and conclusions of law and is relevant to the court's decision, the objection is overruled.  The court further explained that, for evidence not discussed, the court either sustained the objection to the evidence or concluded that it was not necessary for its findings of fact and conclusions of law.

On June 10, 2015, the court conducted a brief final hearing to give the parties an opportunity to make any additional arguments they wished to present to the court before the court issued its ruling in this case.  No additional evidence was heard by the court during this hearing, and nothing

---

[3] Petitioner's Exhibit No. 1 and Respondent's Exhibit No. 8 are the same—the parties' Divorce Decree that contains their custody agreement with respect to J.G.V.

that the court heard during this hearing affected its determination that J.G.V. should be returned forthwith to Mexico to the custody of his mother.

The facts contained herein are either undisputed, or the court has made the finding based on the credibility or believability of each witness.   In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Petitioner or Respondent; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.   When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony. To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

## II.    Findings of Fact

### A.    Witness Credibility and Weight Given to Testimony

During the course of the bench trial, the court had the opportunity to observe at length the demeanor of the witnesses and assess their credibility.   Petitioner, J.G.V.'s mother, was the first witness to testify.   She provided extensive testimony and factual detail in support of her Petition regarding her relationship with Respondent and the events that transpired after J.G.V.'s birth up until the trial. Petitioner, whose first language is Spanish, testified in English.   Petitioner was articulate

and answered questions on direct examination and cross-examination without hesitation and with specificity by providing dates and detailed testimony regarding events that occurred over a ten-year period.  As a result, the court found her version of the events, that transpired before and after this case was filed, to be credible and reasonable.   Overall, Petitioner was far more credible and believable than Respondent, J.G.V's father.  Petitioner came across as genuinely concerned for J.G.V.'s overall well-being, and her testimony on cross-examination was consistent with that previously given during her direct examination.  In addition, she provided plausible explanations in response to the questions asked of her regarding J.G.V., her relationship with Respondent, and the events in question.

Respondent was called as a witness in Petitioner's case-in-chief and only testified briefly. The majority of his testimony regarded matters that are either immaterial or only somewhat relevant to Plaintiff's claim or Respondent's defenses.  Respondent, whose first language is also Spanish, testified through an interpreter.  This, however, did not affect the court's ability to observe his demeanor and assess his credibility.   Unlike Petitioner, Respondent was a reluctant witness and unable to recall many details regarding significant dates, events, and persons who allegedly provided counseling of some sort to J.G.V. before Ms. Garcia.  Respondent's inability on numerous occasions to readily answer questions posed to him and recall details causes the court to question his overall ability to recall key events. Respondent also had an unsettling and distracting smirk on his face the entire time that Petitioner testified, which undermined his credibility and led the court to believe that J.G.V.'s removal from Mexico and the custody suit was motivated by Respondent's desire to spite Petitioner.  Because the court found Petitioner to be far more credible, the court attributed more weight to her testimony than Respondent's testimony.

**Memorandum Opinion and Order - Page 8**

Given the level of factual detail and consistency in Petitioner's testimony, the court also attributed more weight to her testimony than Ms. Garcia's and J.G.V.'s testimony, particularly when there were inconsistencies in the witnesses' testimony.  Unlike Ms. Garcia, who only had five counseling sessions with J.G.V., without his father, in January and February 2015, Petitioner is intimately familiar with her son because he resided with her his entire life before being removed from Mexico in July 2014. Further, Ms. Garcia's diagnosis and counseling of J.G.V. are based entirely on the incomplete and inconsistent information provided by J.G.V., whom the court finds to be insufficiently mature, and Respondent, who had a motive to influence the counseling sessions, as he had previously filed a state court action to modify custody and was aware that Petitioner had filed this federal action to return J.G.V. to Mexico.  While Ms. Garcia does not "have a dog in this fight," she was less cooperative and provided more nonresponsive answers to questions on cross-examination, particularly when her diagnosis, opinions, and the sources of information that formed the bases of her opinions were scrutinized by Petitioner.  Additionally, for the reasons herein explained, the court concludes that Ms. Garcia's testimony and opinions are based on incomplete or insufficient data, and, thus, they do not have the requisite indicia of reliability under Rule 702.

As previously noted, the court also conducted an in camera interview of J.G.V. at the request of the parties to determine whether he is of an age and maturity that his preference as to place of residence should be taken into account.  The court found J.G.V. to be an inquisitive and fairly well-adjusted child given the circumstances.  J.G.V., however, had difficulty explaining simple concepts like the difference between the truth and a lie.[4] The court therefore did not take his testimony under

---

[4] When the court asked J.G.V. to explain what a lie meant, he responded that "sooner or later lies come out to reveal themselves."  When the court inquired again what a lie meant to him, J.G.V. similarly responded "like I was telling you when something later on comes to light."  *Id*. When the court asked the question a different way—"But if somebody

oath.  J.G.V. also did not understand the purpose of the proceedings in this case.  J.G.V. incorrectly believed or was led to believe by his father that, if his father won this case, his mother would be able to stay and live in the United States.

Additionally, certain statements by J.G.V. led the court to conclude that he had been unduly influenced by Respondent and members of Respondent's family.  J.G.V. description of how he would hide to talk to his mother in private on the telephone to avoid scrutiny from his uncles[5] is similar to and consistent with Petitioner's testimony that she had sneak to talk in private on the telephone without Respondent's knowledge because he required her to talk using the speaker on the telephone, so he could listen to her conversations.

It was also apparent from J.G.V.'s testimony and recollection of certain events and persons that his comprehension of time and space is not fully developed.  When asked how long he had to stay in the bathroom, he did not specify an amount of time in minutes or days but simply said that he was only be let out to eat, go to bed, or go to school.  In some instances, he seemed to be able to recall with precision events that occurred years ago, but he could not remember the names of his best friends in Mexico who he had not seen for several months. Finally, some of the information that J.G.V. provided to the court regarding critical issues differed from and was inconsistent with the information that he provided to Ms. Garcia or Respondent.  For example, according to Ms. Garcia

---

says this is true and that is not true, do you know what that means?"—J.G.V. responded "Huh? Uh-uh, no."  The court has interacted with a number of children between the ages of six and nine and is certainly able to determine whether a child in this age group understands the difference between the truth and a lie. J.G.V.'s inability to adequately explain the difference between these two basic concepts is a factor in the court's determination regarding J.G.V.'s level of maturity and Respondent's maturity-of-child defense.

[5]  J.G.V. told the court that, when talking to his mother on the telephone, he would go into his bedroom and close and lock the bedroom door to avoid his uncles' critique of everything he said to his mother.

and Respondent, J.G.V. was having nightmares when he first started seeing Ms. Garcia.  Ms. Garcia, and presumably Respondent, attributed the nightmares to the random kidnapping incident that occurred three years earlier.  J.G.V., however, told the court that he had not had a nightmare since he lived in Cuernavaca, Mexico, which was two or three years ago according to Petitioner's testimony.

Additionally, J.G.V. believed that he had resided in Acapulco after living in Cuernavaca, before moving to Monterrey, where he lived when his father removed from Mexico to the United States.  As explained below, however, J.G.V.'s mother testified that they moved from Acapulco to Cuernavaca shortly after the kidnapping, and that they then moved to Monterrey.  This testimony by Petitioner is not in dispute.

J.G.V. also told Ms. Garcia that he had to go to school with a bruise on his face or busted lip, and Ms. Garcia concluded that this detail made his account of the one-time slap by his stepfather more believable.  J.G.V.'s account to the court was somewhat different.  J.G.V. told the court that the same incident with his stepfather occurred before he went on vacation with his father, and that he had to go on vacation, not school, with a busted lip.  Respondent, however, never reported seeing a bruise on J.G.V.'s face.  Similarly, there was no evidence that anyone at J.G.V.'s school in Mexico ever reported seeing a bruise on his face.   For all of these reasons, the court gives little, if any, weight to J.G.V.'s testimony in deciding the issues in this case.  For the same reason, the court discounts Ms. Garcia's testimony and opinions that are based on statements that J.G.V. made to her or Respondent.

### B.    The Parties' Upbringing in Acapulco, Mexico

Petitioner is a twenty-eight-year-old Mexican citizen, who was born in Ciudad Juarez, Chihuahua.  Petitioner now lives in Monterrey, Mexico, with her husband Jorge, who she married in August 2013.  Petitioner resided with her family in Acapulco, Mexico, until the age of nineteen, when she traveled to Texas for the first time on May 28, 2005, on a student visa to attend summer school at Tyler Junior College, where she studied to be a registered nurse.  Petitioner's immediate family still resides in Acapulco.

Respondent was born in California and is a United States citizen.  He is twenty-seven years old.  Most of Respondent's family members currently reside in Acapulco, Mexico, where Respondent lived most of his life with his family before moving to Phoenix, Arizona, on June 1, 2005.  Respondent's  family joined him temporarily in Phoenix, Arizona, a short time later. Petitioner and Respondent first met in 2004 and began dating while they were both living in Acapulco.  Petitioner was eighteen-years old, and Respondent was seventeen-years old at the time.

### C.    The Parties' Temporary Residence in Phoenix, Arizona

As noted above, Petitioner left Acapulco, Mexico, to attend college in Tyler, Texas, in the summer of 2005, and Respondent moved to Phoenix a couple of days later.  On July 17, 2005, Petitioner went to Phoenix to visit Respondent for his birthday and stayed one week before returning to Tyler.  After completing her summer school classes, Petitioner returned to Phoenix to visit Respondent for another week and decided to extend her stay after learning that her parents were upset about her traveling to Phoenix to see Respondent without their permission.

Respondent testified that he moved or returned to the United States because he had previously spent some time in California while on vacation and liked it.  The parties dispute why

Respondent and his family made the sudden decision to move to the United States when they did.[6]
Except for a couple of brothers, Respondent's family has since returned to Acapulco.  Respondent
currently lives in Dallas, Texas, with his two brothers and his brother's wife.

**D.      J.G.V.'s Birth in Phoenix**

Petitioner became pregnant with J.G.V. in September 2005.  Petitioner and Respondent
married on January 14, 2006, in Phoenix.  J.G.V. was born in Phoenix on June 27, 2006.  Soon after
J.G.V. was born, Petitioner was almost twenty-years old at the time, and Respondent was almost
nineteen-years old.   After J.G.V. was born, the couple's relationship changed and began to
deteriorate.  Petitioner testified that Respondent became possessive and jealous and did not want to
spend time with J.G.V.  Respondent instead preferred to give the child to his parents, so he could
spend time with Petitioner alone, and he became upset when Petitioner spent time caring for J.G.V.
rather than devoting all of her attention to him.   In December 2006, Respondent became angry with
Petitioner for wanting to bring a portable crib to Respondent's uncle's house where everyone was
gathering for Christmas dinner.  Respondent pulled her by the hair and threatened to beat her if she
called the police.

---

[6] The court did not find Respondent's stated reason for suddenly moving to the United States in 2005 to be
credible; however, the court only considers Petitioner's testimony, that Respondent and his family moved to the United
States to avoid the revenge of a family physically harmed by Respondent or a relative of Respondent, for the limited
purpose of determining that Respondent's move to the United States in 2005 was not intended at the time to be
permanent; rather, Respondent's intent, according to Petitioner's testimony, which was not rebutted by Respondent, was
to return to Acapulco as soon as it was safe for him to do so.   In other words, there is no evidence that Respondent's
move to the United States in 2005 was ever intended to be permanent. In making this determination, the court only
considered Petitioner's testimony that was based on what Respondent told her regarding his reason for moving to the
United States.  Respondent's hearsay objection to Petitioner's testimony regarding what others told her is therefore moot.

E.      **Petitioner's Return to Acapulco, Mexico, with J.G.V.**

After the Christmas incident and learning why Respondent allegedly moved to the United States in 2005, Petitioner was afraid to stay with Respondent and began expressing her desire to return to Mexico with J.G.V.  Petitioner asked Respondent to give her authorization to return to Mexico with J.G.V.  Respondent initially refused but ultimately agreed to Petitioner returning to Mexico with J.G.V. on the condition that she first obtain a green card and residency status in the United States.  Respondent also conditioned Petitioner's leaving the United States with J.G.V. on her agreement to not request child support.

After Petitioner agreed to both conditions, arrangements were made for Petitioner and J.G.V. to fly to Mexico, and Respondent took Petitioner and J.G.V. to the airport.  Petitioner testified that Respondent told his parents that she and J.G.V. were only going to Mexico temporarily, so they would not oppose the decision, but he knew that she and J.G.V. did not plan on returning to the United States and he was "okay with that."  Petitioner, therefore, returned to Mexico with J.G.V. in October 2007 to live with her parents in Acapulco.  J.G.V. was only sixteen months old at the time.

After Petitioner and J.G.V. left the United States in October 2007, Respondent visited J.G.V. periodically in Acapulco and telephoned monthly.  Respondent visited J.G.V. the first time in December 2007. Petitioner was afraid to leave J.G.V. alone with Respondent and told him that she wanted to be present when he visited J.G.V.  To alleviate her concern, Respondent assured Petitioner that he would never harm J.G.V.  Respondent and his family in Acapulco attempted to convince Petitioner to return to the United States.  Petitioner, however, repeatedly asked Respondent for a divorce.  Respondent refused Petitioner's requests for a divorce and threatened that he would take J.G.V. away from her and kill her if she dated anyone.

**Memorandum Opinion and Order - Page 14**

**F.      Petitioner's Two Visits to the United States with J.G.V. after Returning to Mexico**

After leaving the United States, Petitioner and J.G.V. returned to the United States together two more times.  Respondent testified that Petitioner traveled with J.G.V. to the United States for his father's birthday on January 10, 2008, so Respondent could spend time with J.G.V.  Respondent, however, did not indicate how long Petitioner and J.G.V. stayed in the United States before returning to Mexico.

In January 2009, Petitioner registered J.G.V. in Mexico to give him a dual nationality and enroll him in school in Mexico.  J.G.V. was also diagnosed in January 2009 with a heart condition, which required surgery.  At the time, Petitioner was working at a resort hotel and going to college, and Respondent was living and working in South Carolina doing construction work.  Petitioner and Respondent agreed that it would be better for J.G.V. to receive necessary medical treatment in the United States.  Petitioner and J.G.V. returned temporarily to the United States a second time in 2009.  They first flew to South Carolina.  After doing research, Petitioner made the decision to take J.G.V. to Miami Children's Hospital for his surgery.  Petitioner and J.G.V. moved to Miami, Florida, until J.G.V. had the surgery on April 15, 2009.  It is unclear whether Respondent was also living in Miami during this time; however, Petitioner testified that they all drove back to South Carolina together as soon as the doctor at Miami Children's Hospital told them that J.G.V. was well enough to travel by automobile to South Carolina.

As instructed, Petitioner took J.G.V. to see another doctor in South Carolina fifteen days later to determine whether he was well enough to fly back to Acapulco.  The doctor in South Carolina confirmed that J.G.V.'s health was good and that he could fly to Acapulco. When Petitioner first

talked to Respondent about returning to Acapulco with J.G.V., Respondent tried to convince her that he had changed his ways, in an attempt to get her to stay in the United States. Petitioner, however, told Respondent that she no longer loved him and that she wanted to return to Mexico. Respondent became upset and again warned Petitioner that he would kill her if she was dating anyone. Respondent was first reluctant to authorize Petitioner's return to Mexico with J.G.V. but relented a couple of days later and took them to the airport so that they could return to Mexico. Upon returning to Mexico, Petitioner and J.G.V. lived with her parents in Acapulco.

Petitioner met her current husband Jorge in January 2012 through a friend at work, and they began dating seriously. At the time, Jorge was working for the city of Acapulco under the chief of police in an administrative capacity. Petitioner testified that she was afraid to tell Respondent about Jorge because of his prior threats. When she finally told him, Respondent was not upset because he was also dating someone else.

In June 2012, Petitioner, Jorge, and J.G.V. went to Jorge's parent's home in Acapulco. Later that evening, when Jorge drove Petitioner and J.G.V. to her parents' home, another vehicle cut them off just as they were arriving at her parents' home, and four men with guns kidnapped Jorge, Petitioner, and J.G.V., who was around five years old at the time. They were kept for three days in a vehicle in an unknown location until Jorge's, Petitioner's, and Respondent's family members paid the ransom demanded by the kidnappers for their release. While in captivity, the three were allowed to eat and drink in the vehicle where they were kept and were allowed outside to go to the bathroom. According to J.G.V., an outdoor party took place close to the vehicle where they were held.

After the kidnapping incident, Petitioner and J.G.V. moved three hours away to Cuernavaca, Mexico, with Respondent, who had been assigned to work as a bodyguard or commissioner for the

"Syndic," which, according to Petitioner, means public safety or law enforcement department in English. Jorge's new position involved bulletproof vehicles and, on one occasion, Petitioner and J.G.V. went with Jorge to Mexico City to have repairs done to two bulletproof vehicles.

Respondent attempted to convince Petitioner to go back to Acapulco after the kidnapping incident so his family and people could watch over her and J.G.V. and keep them safe. Alternatively, Respondent suggested that Petitioner return to the United States with J.G.V. to live with him, even though by this time he had a daughter with the woman that he was dating. Respondent explained during the bench trial that Maria, the woman he was dating at the time and later married, is a Mexican citizen, lives in Acapulco, has never been to the United States, and has no plans to come to the United States. By this time, Petitioner's and Jorge's relationship was quite serious, and Petitioner refused to return to Acapulco or the United States and again asked Respondent for a divorce. Respondent, on the other hand, testified that Petitioner never asked him for a divorce and that it was he who asked Petitioner for a divorce sometime in 2012 because he wanted to marry Maria.

### G.    June 11, 2012 Divorce and Custody Agreement

The parties agreed in 2012 to divorce, and Respondent filed for divorce in Dallas County, Texas, on June 11, 2012. Petitioner testified that, as part of their agreement to divorce, the parties verbally agreed that the custody arrangement for J.G.V. would remain the same as follows: Petitioner would have joint custody of J.G.V.; J.G.V. would always continue to reside with Petitioner in Mexico; and Respondent would continue to see J.G.V. during vacation visitations. The parties' Divorce Decree, which was entered on November 8, 2012, by the 302nd Judicial District Court, Dallas County, Texas, gives Petitioner the "exclusive right to designate the primary residence of

[J.G.V.] without regard to geographic location." Pet'rs Ex. 8 at 5. The Divorce Decree also states: "**The parties have agreed not to limit the residency of the child to Dallas or any other county**." *Id*. at 6 (emphasis in original). Pursuant to the Divorce Decree, Respondent was entitled to possession of J.G.V. during certain time periods, including thirty consecutive days during the summer beginning on July 1 at 6 p.m. and ending at 6 p.m. on July 31. *Id.* at 8.

After their divorce was final, Respondent married his girlfriend Maria in January 2013, and Petitioner married Jorge in August 2013. A short time after marrying, Petitioner and Jorge began considering whether they should move to Monterrey, Mexico, where Jorge's parents reside. Respondent was initially unhappy about Petitioner moving to Monterrey and preferred that she live in Acapulco to remain close to his family, but Respondent "came around" after being assured that he would continue to be able to see J.G.V. during summer vacations. According to Petitioner, J.G.V. was excited about moving to Monterrey and has enjoyed living there. During the entire time that Petitioner and J.G.V. have lived in Mexico since 2007, J.G.V. has attended school in Mexico, and the parties continued under their agreed-upon custody and visitation arrangement until the summer of 2014.

> **H.     Respondent's Retention of J.G.V. in July 2014 Beyond his Authorized Summer Visitation and Removal of J.G.V. to the United States Without Petitioner's Permission or Knowledge**

After J.G.V.'s eighth birthday in June 2014, Respondent requested to spend two weeks with J.G.V. in Acapulco in July 2014. Petitioner and Respondent agreed that after Respondent spent two weeks with J.G.V., he would take the child to Petitioner's parents' home in Acapulco on July 24, 2014, where he would stay an additional week with his grandparents before returning to Monterrey. Petitioner's parents were going to take J.G.V. to the airport in Acapulco when it was time for him

to return to Monterrey.  With this in mind, Petitioner purchased a round-trip airline ticket for J.G.V. to travel from Monterrey to Acapulco on July 5, 2015, and from Acapulco to Monterrey on July 29, 2014.  Before sending J.G.V. to Acapulco to see his father, Petitioner purchased a cellular telephone for J.G.V., so she could communicate with him every day while he was gone.

On July 23, 2014, rather than taking J.G.V. to his grandparents' home, Respondent advised Petitioner that he had recently taken J.G.V. to see a psychologist in Acapulco and had made the decision to take J.G.V. to the United States with him to see another psychologist.  Respondent then drove with J.G.V. to Juarez, Mexico, and from there, they flew to Dallas, Texas.  Petitioner pleaded with Respondent to return J.G.V. and indicated that, if Respondent believed that J.G.V. needed to see a psychologist, she could arrange for all of them to go together to see a psychologist of his choice in Mexico.  Respondent rejected Petitioner's request and did not allow J.G.V. to answer his mother's calls on his cellular telephone until the next day.  When Petitioner finally spoke with J.G.V., he indicated that he thought he was only going to be staying with his father in Dallas for a few days.  When Petitioner asked Respondent to confirm when J.G.V. would be returned to her in Mexico, however, Respondent would not say whether or when he was going to return J.G.V. to Mexico.  The following day when Petitioner spoke to Respondent again, he confirmed that he would not be returning J.G.V. to Mexico and was instead going to take steps in the United States to gain primary custody of J.G.V.

On July 29, 2014, the day she learned that Respondent was planning on removing J.G.V. to the United States and retaining possession of J.G.V. past the agreed-upon visitation period, Petitioner filed a criminal complaint against Respondent with the police in Monterrey, Mexico.  She then filed

an application for J.G.V.'s return with the Mexican Central Authority on August 13, 2014. Petitioner subsequently initiated this wrongful removal and retention case with this court on November 6, 2014.

**I.** **Respondent's Filing of State Case to Modify Custody Agreement in August 2014**

Within two weeks of bringing J.G.V. to the United States, Respondent filed a proceeding in Dallas County, Texas, on August 12, 2014, requesting to modify the parties' custody agreement on the grounds that J.G.V. was the victim of unspecified family violence at the hands of Petitioner. Respondent also alleged that Petitioner had relinquished her possession and primary care of J.G.V. for more than six months. Respondent requested, among other things: (1) that he be designated as the person with authority to designate the primary residence of J.G.V.; (2) that J.G.V.'s residence be restricted to Dallas, Texas, and contiguous counties; (3) that Petitioner be enjoined from removing J.G.V. beyond this geographic area; (4) that Petitioner be required to pay child support and maintain health insurance for J.G.V.; and (5) that Petitioner be denied access to J.G.V. or limited to supervised visits with J.G.V.

Respondent sent Petitioner a copy of a waiver of service and requested her to sign it but did not say what the waiver of service pertained to when Petitioner inquired. After Petitioner declined to sign the waiver, Respondent would not allow Petitioner to talk to J.G.V. on the telephone except for a few minutes on two occasions in October and December 2014. Petitioner testified that she nevertheless continued to call J.G.V.'s cellular telephone sometimes as many as twenty times per day hoping that J.G.V. or Respondent would answer. J.G.V. told the court that he loved and missed his mother, and that he would talk to his mother in his bedroom with the door closed to avoid scrutiny from his uncles about what he had said to his mother. Respondent ultimately arranged to

have Petitioner served with a citation and the petition to modify the parent-child relationship in the state custody case when she appeared and testified in the bench trial of this case. At the conclusion of the trial, Petitioner was allowed to spend a few hours alone with J.G.V. before returning to Mexico.

**J.      J.G.V.'s Counseling Sessions with Ms. Garcia in January 2015**

While living with his father, two uncles, and aunt, J.G.V. attended school in Dallas County. In January 2015, after Petitioner filed this lawsuit under the Hague Convention, and several months after J.G.V. was removed from Mexico to the United States, Respondent arranged for J.G.V. to see a counselor in Dallas, Texas. J.G.V. had six hourly sessions with Ms. Garcia in January and February 2015 before the trial of this case.

Ms. Garcia testified that Respondent found her on the internet where she is registered on the website "Psychology Today." Respondent attended the first counseling session with J.G.V. on January 2, 2015, and explained to Ms. Garcia in J.G.V.'s presence why he believed his son needed counseling. Ms. Garcia testified, and her therapy notes so indicate, that, in the first session with Respondent and J.G.V., Respondent reported that J.G.V. was afraid of the bathroom; he was having frequent nightmares; he had verbally expressed anxiety about returning to Mexico to live with his mother; and he had been suspended from school as a result of an incident with another child who threatened J.G.V. and whom J.G.V. threatened in response.[7] Respondent also disclosed that J.G.V.

---

[7] Petitioner objects to evidence regarding these and other statements by Respondent to Ms. Garcia on hearsay grounds. Respondent responds that such evidence is admissible under Federal Rule of Evidence 803(4). The court agrees and **overrules** Petitioner's hearsay objection. Rule 803(4) excepts from the hearsay rule statements made that pertain to medical diagnosis or treatment and "describes medical history; past or present symptoms or sensation; their inception; or their general cause." Fed. R. Evid. 803(4); *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 272 (5th Cir. 1991). Petitioner contends that Rule 803(4) only applies to statements made by patients; however, the rule does not expressly limit its application to statements by patients. Accordingly, Respondent's and J.G.V.'s statements to Ms. Garcia that were made for purposes of J.G.V.'s diagnosis or treatment are admissible. Based on Ms. Garcia's testimony, the

had been in his custody for five months, and that he was engaged in litigation with his ex-wife over custody of J.G.V.  Respondent provided a small portion of the Divorce Decree to Ms. Garcia that indicated he had joint custody of J.G.V. with his ex-wife.  Respondent, however, failed to disclose to Ms. Garcia that he had removed J.G.V. from Mexico and kept him past his normal visitation possession period in violation of the Divorce Decree without his ex-wife's permission.  Respondent also failed to disclose that the Divorce Decree gave his ex-wife the exclusive right to designate the primary residence of J.G.V. without regard to geographic location.

According to Ms. Garcia, J.G.V. reported to her, during their sessions without Respondent, that: (1) he had been locked in the bathroom for days and was only let out to eat three meals but was not given any snacks and was scared of being locked in the bathroom; (2) his stepfather hit him across the face one time, leaving a bruise on his face, and he had to go to school with the bruise on his face; (3) in 2012, he, his mother, and stepfather were kidnapped at gunpoint and held for ransom for three days in an automobile, that he was really scared after the kidnapping incident, although no one was physically harmed, and that he had nightmares that people were coming after him; (4) he was confused why his stepfather drove a bulletproof vehicle and that he was scared of his stepfather; (5) his stepfather would call him names and "put him down" verbally; and (6) he loves his mother, but he is afraid of his stepfather and of being returned to Mexico to live with his mother and stepfather.

---

court further concludes that her records regarding J.G.V. fall within the business record exception to the rule against hearsay.  Fed. R. Evid. 803(6).  Petitioner also contended that any opinion Ms. Garcia reached regarding J.G.V.'s diagnosis and treatment based on information provided by J.G.V. or his father is unreliable.  Petitioner's reliability objection is addressed later in this opinion.

Ms. Garcia was also requested by Respondent to testify as an expert witness in this case.  In response to questions by Respondent, Ms. Garcia opined that: (1) J.G.V. suffered or sustained psychological and physical abuse as a result of being "put-down" and called names by his stepfather; being locked in a bathroom for days; being struck on the face one time by his stepfather with sufficient force to cause a bruise or laceration; and being kidnapped for ransom in 2012 at gunpoint and held in an automobile for three days together with his mother and stepfather; (2) J.G.V. could suffer similar harm or abuse if he is returned to Mexico to live with his mother and stepfather and subjected to traumatic events similar to those that he previously experienced; (3) the anxiety she observed in J.G.V. was more consistent with being kidnapped and locked in a bathroom for days as opposed to being put in the bathroom for a time-out for thirty minutes; and (4) J.G.V. was not unduly influenced by his father or other family members; from her interaction with J.G.V., she believed he was being truthful because of the details he provided about not getting snacks and having to go to school with a bruise on his face.[8]

Petitioner, on the other hand, thought it seemed strange that J.G.V. was now expressing fear of going to the bathroom after living with his father for several months.  Petitioner testified that, while J.G.V. lived with her, he would ask for his toys or his toy cars so he could play with them

---

[8] The examination by Respondent of Ms. Garcia regarding her methodology and opinions was haphazard and willy-nilly, making it difficult for the court to determine the precise matters on which Ms. Garcia was being offered to provide an expert opinion.  On the first day of her examination, Ms. Garcia initially volunteered to the court and expressed concern that she was not aware that Respondent had called her as a witness for the purpose of providing expert testimony.  Ms. Garcia also stated that she could only testify regarding J.G.V.'s symptoms, treatment, and progress; however, on the second day of the trial during her direct and redirect examination by Respondent, Ms. Garcia willingly opined about a number of things beyond J.G.V.'s symptoms, treatment, and progress.  As best as the court can tell from reviewing the transcript of the two-day bench trial, the four matters listed are the main issues upon which Ms. Garcia was requested to and did express opinions.  Petitioner repeatedly objected to Ms. Garcia testifying as an expert.  The court did not previously rule on whether Ms. Garcia's testimony satisfies Rule 702's requirements for expert testimony.  The court instead indicated that it would take this matter and Petitioner's objections to Ms. Garcia testifying as an expert under advisement.

while bathing and was never before afraid of the bathroom.  Petitioner explained that, when J.G.V.

misbehaved, he would be disciplined or corrected, not punished, with a time-out in the bathroom,

usually with the bathroom door open, so Petitioner could check on him periodically.  Petitioner

testified that, sometimes she closed the door, but she did not lock it.  Petitioner clarified that J.G.V.

was only put in time-out for thirty minutes, not for days as Ms. Garcia testified, and only long

enough to make him understand that his bad behavior was inappropriate.  Petitioner testified that she

would put J.G.V. in a time-out while she was preparing meals and, when it was time to eat the meal,

she would bring him out of the time-out, and he would go back to the bathroom for the remaining

amount of the time-out after he finished eating.  Petitioner explained that she had previously

attempted to discipline J.G.V. by putting him in a time-out in his bedroom and the living room, but

he would play with his toys, and this is why she resorted to using the bathroom for time-outs.  When

asked if her husband Jorge had ever hit J.G.V. hard enough to leave a bruise on his face, she

steadfastly maintained that this never happened. Other than J.G.V.'s inconsistent statements to Ms.

Garcia and the court, there is no evidence that J.G.V.'s stepfather struck him on the face with

sufficient force to leave a bruise or laceration.

## III.    Conclusions of Law

### A.    Overview of Law Applicable to Wrongful Removal or Retention Cases

The Convention was adopted to address the problem of international child abductions in

connection with domestic disputes.  *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).  The purpose of the

Convention is to "to secure the prompt return of children wrongfully removed to or retained in any

Contracting State," and "to ensure that rights of custody and of access under the law of one

Contracting State are effectively respected in the other Contracting States." *Id.* (quoting Convention,

art. 1).  Under the Convention, a child who is abducted in violation of the "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply." *Abbott*, 560 U.S. at 5.

The Convention is implemented through the ICARA.  *Id.*  Under the ICARA, state courts and federal district courts have concurrent original jurisdiction over actions arising under the Convention. 22 U.S.C. § 9003(a).  A person, who seeks the return of a child wrongfully removed or retained may file a petition for relief "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *Id.* § 9003(b).  It is undisputed that J.G.V. was located in Dallas County, Texas, when Ms. Vega Ostos filed her Petition under the Convention.  The court therefore has jurisdiction over this action. The Federal Rules of Evidence apply to wrongful removal and retention cases brought under the Convention.  *Vazquez v. Vasquez*, No. 3:13-CV-1445-B, 2013 WL 7045041, at *1 n.1 (N.D. Tex. Aug. 27, 2013) (citing cases).  Authentication requirements, however, are relaxed.  *See* 22 U.S.C. § 9005.

When a child less than sixteen years of age has been wrongfully removed or retained and less than one year has elapsed between the alleged wrongful removal or retention and the commencement of return proceedings, the court in the country to which the child has been brought must "order the return of the child forthwith," unless one of the Convention's limited exceptions apply.  *Abbott*, 560 U.S. at 9; 51 Fed. Reg. at 10507.  Even when return proceedings are initiated after the expiration of one year, Article 12 of the Convention requires return of the child unless it is shown that the child is settled in his or her new environment.  *Id.*  Petitioner filed this case within a few months of J.G.V.

being removed and retained.   Accordingly, the court must order J.G.V. to be returned to Mexico, unless it determines that one of the Convention's limited affirmative defenses applies.

### B.      Petitioner's Burden of Proof

To establish a claim for wrongful removal or retention under the Convention, the petitioner must establish by a preponderance of the evidence the following three elements: (1) that "the respondent removed or retained the child somewhere other than the child's habitual residence"; (2) that the removal or retention was wrongful in violation of the petitioner's custody rights; and (3) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012).

A parent's removal or retention of a child is considered wrongful "when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) (citing Convention, art. 3).   "[R]ights of custody" are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)).   The phrase "place of residence" encompasses the child's country of residence. *Abbott*, 560 U.S. at 9. The right to choose the child's country of residence is a right "relating to the care of the person of the child." *Id.*

Pursuant to Article 3 of the Convention, rights of custody may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement.  Convention, art. 3. When no formal custody agreement exists between the child's parents, courts must apply the laws

of the country of the child's habitual residence to determine whether the nonremoving parent had

"rights of custody" within the meaning of the Convention. *Sealed Appellant*, 394 F.3d at 343.  Here,

the parties acknowledge and have stipulated that a formal custody agreement exists and the terms

of that agreement are included in their Divorce Decree, and it is a legally binding document between

Petitioner and Respondent.  The court therefore need not resort to the laws of J.G.V.'s habitual

residence and will use the parties' custody agreement to determine whether Petitioner had rights of

custody under the Convention.  The Convention's return remedy does not change custody rights that

existed prior to the wrongful removal of a child and is not a determination regarding the merits of

any custody issue.  *Abbott*, 560 U.S. at 9 (citing Convention, art. 19).

Neither the Convention nor ICARA defines "habitual residence."  *See Larbie*, 690 F.3d at

310.  "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive

determination that necessarily varies with the circumstances of each case."  *Id.* (citation omitted).

 The Fifth Circuit follows an approach that "begins with the parents' shared intent or settled purpose

regarding their child's residence."  *Id.* (citation omitted).    "A shared parental intent requires that

the parents actually share or jointly develop the intention. In other words, the parents must reach

some sort of meeting of the minds regarding their child's habitual residence, so that they are making

the decision together." *Berezowsky v. Ojeda*, 765 F.3d 456, 468 (5th Cir. 2014) (citing *Larbie*, 690

F.3d at 310).  This approach "gives greater weight to the parents' subjective intentions relative to

the child's age" than the child's experience, particularly when the child is so young that "he or she

cannot possibly decide the issue of residency."  *Id.* (citation omitted).  Under this approach:

> the threshold test is whether both parents intended for the child to abandon the
> [habitual residence] left behind. Absent shared intent, prior habitual residence should
> be deemed supplanted only where the objective facts point unequivocally to this
> conclusion. Notably, when the child's initial move from an established habitual

residence was clearly intended to be for a specific, limited duration[,] . . . most courts will find no change in habitual residence. Mere retention in another country and "private reservations" or intentions that are made "manifest and definitive" only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence.

*Id.* at 310-11 (internal quotations and citations omitted).

### C.     Respondent's Burden of Proof

If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, the burden shifts to the respondent to prove an applicable affirmative defense. *See* 22 U.S.C. § 9003(e)(1).  Even if the child has been wrongfully removed, return is not required if the removing parent can establish that an exception under the Convention applies. *Abbott*, 560 U.S. at 22.  The Convention recognizes several narrow affirmative defenses if a respondent "opposes the return of the child."  Convention, arts. 12, 13, 20; 22 U.S.C. 9003(e)(2). A respondent may show by clear and convincing evidence[9] that there is a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. 9003(e)(2)(A).  The level of harm necessary to trigger the Article 13(b) exception must be "a great deal more than minimal." *Sanchez*

---

[9] Civil cases are typically decided by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-88 (1983).  Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely than not. *Id.* at 390.  Thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that his or her version of the facts is true. *Id.*  The "clear and convincing evidence standard" is a high standard that is "higher than the preponderance of the evidence standard, common in civil cases, but not as high as beyond a reasonable doubt." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation and internal quotation marks omitted); *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).  "Clear and convincing evidence" means evidence "so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 395, n.9 (5th Cir. 2004) (quoting *Travelhost, Inc.*, 68 F.3d at 961) (internal quotation marks omitted).

*v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) (citation omitted).[10]  A respondent may show by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, art. 20;  22 U.S.C. 9003(e)(2)(A).

Pursuant to Article 12, if the petition is filed more than one year after the removal, a respondent may argue that the child is now "well-settled" in his or her new environment. Convention, art. 12; 22 U.S.C. 9003(e)(2)(B). This defense must be established by a preponderance of the evidence.  *Id.*  It is also a defense to wrongful removal if a respondent can show by a preponderance of the evidence that the petitioner was "not actually exercising the custody rights at the time of removal or retention," or that the petitioner "had consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). The Convention also provides that "[t]he judicial or administrative authority [considering a petition] may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13.

---

[10] The grave risk defense "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests"; nor was it intended to encompass situations such as the return to a home where money is in short supply or where educational opportunities are more limited."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (March 26, 1986).  It instead was intended to apply to situations where the risk to the child is "grave, not merely serious."  *Id.*  An example of such a situation is one involving sexual abuse of a child by a custodial parent.  *Id.*  A grave risk or intolerable situation also exists when returning a child would send him or her "to a zone of war, famine, or disease, or in cases of serious abuse or neglect." *Vazquez v. Estrada*, No. 3:10-CV-2519-BF, 2011 WL 196164, *5 (N.D. Tex. Jan. 19, 2011) (finding no grave risk exception despite evidence of "spiraling [drug cartel] violence and surge in murders in Monterrey" and evidence of "specific violent acts that have been committed in the school [that the child] attended in Monterrey and in the neighborhood where Petitioner resides."). "Evidence of adjustment problems attending relocation and separation from a parent are inapposite to the grave risk determination."  *Castro v. Martinez*, 872 F. Supp. 2d 546 (W.D. Tex. Feb. 2, 2012).  Evidence of prior abuse is insufficient, especially when there is conflicting testimony about the alleged abuse.  *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at *5 (S.D. Tex. Aug. 17, 2010).

The age and maturity exception is construed narrowly and must be shown by a preponderance of the evidence. *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000).

### D.    Rule 702 Standard Applicable to Experts

As noted above, J.G.V. had counseling sessions with Ms. Garcia, and Respondent moved to have Ms. Garcia qualified as an expert to provide her opinion regarding the following: (1) whether J.G.V. suffered or sustained any psychological or physical abuse as a result of allegedly being locked in a bathroom for days, being slapped on the face or mouth one time by his stepfather with sufficient force to cause a bruise or laceration, and being kidnapped for ransom in 2012 at gunpoint and held in an automobile for three days together with his mother and stepfather; (2) whether J.G.V. could suffer similar harm if he was returned to Mexico to live with his mother and stepfather and subjected to traumatic events similar to those that he previously experienced; (3) whether the anxiety observed by Ms. Garcia in J.G.V. was consistent with being kidnapped and locked in a bathroom for days as opposed to being put in the bathroom for a time-out for thirty minutes; and (4) whether J.G.V. was unduly influenced by his father or other family members such that the information disclosed by him was not reliable or trustworthy.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  District courts are assigned a gatekeeping role to determine the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-98 (1993).  The court must find that the evidence is both relevant and reliable before it may be admitted.  *Id.*  To do so, the court must evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case.  *Id.* This requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Factors to consider when evaluating reliability include: (1) whether a theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) general acceptance of the theory in the scientific or expert community.  *Daubert*, 509 U.S. at 593-95. The reliability inquiry is flexible, and the judge has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony.  *Id.* at 594-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.  The relevance and reliability of expert testimony turn upon its nature and the purpose for which its proponent offers the testimony.  *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The Advisory Committee's Notes to Rule 702 explain that when a "witness relies solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes (2000 amendments). This is because the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1994) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")). According to the Advisory Committee's Notes, "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 advisory committee's notes (citing *Kumho Tire Co.*, 526 U.S. at 152) ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.")).

## IV.    Application of Law to Facts

### A.    Respondent's Proffer of Ms. Garcia as an Expert

As previously indicated, Ms. Garcia was not aware that she was being called by Respondent to testify as an expert, and, although she initially indicated to the court that she could only testify regarding J.G.V.'s symptoms, treatment, and progress, she ultimately opined regarding a number of matters beyond J.G.V.'s symptoms, treatment, and progress. The court seriously questions whether Ms. Garcia is qualified to testify as an expert in this case, and whether her testimony meets the requirement for expert testimony under Rule 702 of the Federal Rules of Evidence, *Daubert*, and *Kumho Tire*.

Ms. Garcia testified that she is a licensed counselor with a master's degree in counseling; that she has six years of work experience as a counselor; and that she had worked with approximately 100 children or adolescents who were victims of child abuse or experienced a traumatic event. Ms. Garcia testified that her work history included working with children at an unnamed agency, foster care, and her current private practice.  Ms. Garcia indicated that she was trained to determine whether children, including children as young as J.G.V., have been physically or psychologically abused.

While Ms. Garcia testified that she had the requisite specialized "knowledge, skill, experience, training, or education" in determining whether young children have been physically or psychologically abused, she was unable to articulate in any detail, even with assistance from the court, the methodology used by licensed counselors in her field to determine whether a young child has been physically or psychologically abused or unduly influenced by an adult.  Ms. Garcia instead merely stated in conclusory fashion that licensed counselors or therapists: (1) gather information from the client; and (2) go through the "DSM" to ensure that what is being reported fits the criteria in the diagnostic manual.  Moreover, it was only in response to the court's questions that Ms. Garcia confirmed that she was referring to the current or fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5").[11]  Ms. Garcia, however, never identified the section of the DSM-5 that she relied on and applied in diagnosing or assessing J.G.V.; nor is it clear whether she considered and applied the criteria normally applied by professionals in her field. Consequently, the court is unable to determine whether Ms. Garcia's use and application of the DSM-5 was consistent

---

[11] The DSM-5 was published by the American Psychiatric Association in May 2013.  The DSM is an authoritative manual relied on by researchers and mental health professionals to classify and define mental disorders.  The DSM is the collective work of numerous experts, and its purpose is to improve the diagnosis and treatment of persons suffering from mental disorders.

with the manner in which professionals in her field would use and apply it in a situation such as this.

Respondent's unsuccessful attempt to qualify Ms. Garcia as an expert drew numerous objections from Petitioner, and the court advised Respondent's counsel on several occasions that he had not laid the proper predicate under Rule 702 applicable to experts relying primarily on experience. Instead of eliciting testimony from Ms. Garcia regarding the criteria and steps taken by licensed counselors or therapists in determining whether children have suffered a traumatic event or abuse and whether the child's behavior is attributable to the events reported by a child or other adults, Respondent's counsel repeatedly focused on Ms. Garcia's qualifications and her unverifiable observations and opinions. Moreover, as explained above, it is unclear whether she considered and applied the criteria normally applied by professionals in her field. Absent such testimony, the court concludes that the opinions expressed by Ms. Garcia are not sufficiently reliable.

Additionally, no controls were used to ensure that the information reported by Respondent and J.G.V. was truthful, and that the information reported by J.G.V. was not unduly influenced by Respondent or Respondent's family. Ms. Garcia's opinions were also based on insufficient data or facts. Ms. Garcia never asked J.G.V. whether his father told him what to say during counseling sessions or whether his father inquired about what was discussed during counseling sessions. In addition, Ms. Garcia does not appear to have taken into account J.G.V.'s level of maturity. Ms. Garcia instead believed and assumed, based solely on her interactions with J.G.V., that he was being truthful.

Although she was aware of the custody litigation involving J.G.V. and the potential for undue influence by one parent, Ms. Garcia made no inquiries regarding the circumstances giving rise to the

litigation and custody battle or how J.G.V. came to live with Respondent; nor did she think it was odd when Respondent only gave her a portion of the parties' custody agreement. Ms. Garcia did not request information from Respondent regarding the counselor in Mexico who allegedly saw J.G.V. at Respondent's request or the counselor at J.G.V.'s school in Dallas, Texas, who became involved when J.G.V. was suspended; nor did she attempt to contact the counselors or J.G.V.'s mother to verify whether the information reported by Respondent and J.G.V. was accurate.

Ms. Garcia also made no attempt to contact Respondent's wife or girlfriend after J.G.V. reported that he had confided in her about his stepfather hitting him in the face.  Ms. Garcia acknowledged that, although J.G.V. had reported being the target of name-calling and "put-downs" by his stepfather, he was unable to provide any details regarding this general allegation, and he did not respond to Ms. Garcia's questions, for example, regarding the types of names that his stepfather allegedly called him.  Finally, Ms. Garcia assumed, without any attempt at verification, that J.G.V. had spent several or many days at a time in the bathroom as punishment, even though she acknowledged that J.G.V. had never specifically stated how long he was normally required to stay in the bathroom or how frequently he was required to stay in the bathroom.

In addition, Ms. Garcia assumed from the outset, based solely on the information provided by Respondent in J.G.V.'s presence, that J.G.V. had been the victim of abuse or a traumatic event. For example, Ms. Garcia testified that, when talking to J.G.V., she did not directly question him about certain events but instead waited for him to volunteer information because she does not interrogate children who have been through traumatic events.  In addition, Ms. Garcia assumed and concluded, based on information obtained solely from Respondent and J.G.V., that J.G.V.'s alleged general anxiety, fear of the bathroom, nightmares, and school outbursts were caused by: (1) J.G.V.

allegedly being locked in the bathroom for several days at a time; (2) the alleged incident in which J.G.V.'s stepfather hit him on the face; (3) the unspecified name-calling and "put-downs" by his stepfather; and (4) the 2012 kidnapping. Ms. Garcia did so without taking into account other factors that might have caused or contributed to J.G.V.'s anxiety and disruptive behavior.  Ms. Garcia did not consider whether the litigation involving J.G.V. or his parents' divorce and remarrying could have been contributed to his anxiety and disruptive behavior inside and outside of school, even though she acknowledged, as Petitioner had testified, that J.G.V. had a tendency to test the limits behaviorally.  Ms. Garcia apparently discounted the effect of J.G.V.'s parent's divorce, remarrying, and litigation on his behavior; however, it does not take an expert to know that such matters are often the source of stress and anxiety in a child and can certainly have a psychological impact on the child, especially when the divorce is acrimonious and involves prolonged litigation, both of which are present in this case.

Ms. Garcia further testified that, in diagnosing and treating children, she relies heavily on their facial expressions and body language to determine what emotion the child is feeling or expressing nonverbally; however, Ms. Garcia's notes of J.G.V.'s counseling sessions are devoid of any descriptions regarding facial expressions and body language. Instead, Ms. Garcia simply indicates in conclusory fashion in her notes that J.G.V. is anxious, without describing whether he is frowning, looking scared, smiling, sitting still, or fidgeting.  Consequently, the court has no way of independently assessing whether Ms. Garcia's observations of J.G.V. are correct.  In an attempt to rehabilitate Ms. Garcia, Respondent asked her on redirect and she testified that, as a licensed counselor in Texas, she is not required to describe or include in her notes such descriptions.

This question simply misses the mark.  Regardless of what Ms. Garcia is required to do under Texas law or rules applicable to licensed counselors in Texas, Rule 702 requires the court to consider whether Ms. Garcia's opinions and conclusions are based on sufficient facts or data; whether her testimony is the product of reliable principles and methods; and whether she has reliably applied those principles and methods to the facts of this case.  Notably, Ms. Garcia testified on cross-examination that she was unable to describe J.G.V.'s mood or affect by simply reviewing photographs of him interacting with his stepfather, and she indicated that it would be more helpful if she had a video of J.G.V. to review.  On the other hand, Respondent expects the court to take Ms. Garcia's word that J.G.V. appeared "anxious" during his counseling sessions without the benefit of a photograph, video, or description in her notes of what she observed.  Overall, the court found Ms. Garcia's testimony and opinions to be overly simplistic, subjective, conclusory, and unhelpful.  As a result, her approach and conclusions cannot be objectively verified or reasonably assessed for reliability.

Ms. Garcia's decision to rely on selective facts and subjective data go more to the weight to be given to her testimony.  On the other hand, her reliance on incomplete facts or data; her inability to adequately describe the methodology normally used by licensed counselors to determine whether children have been abused or suffered a traumatic event and whether she applied such methodology in evaluating J.G.V.; and her complete lack of controls to enhance truthful reporting by Respondent and J.G.V. leads the court to conclude that her opinions and conclusions are not reliable.  Ms. Garcia's testimony and opinions, for all of the reasons previously stated, fail to meet the requirements of Rule 702 and are disregarded, or given little, if any, weight by the court.

B.      **Petitioner's Prima Facie Case**

1.      **Habitual Residence**

The evidence in this case leads the court to conclude that J.G.V.'s habitual residence is Mexico.  J.G.V. only speaks Spanish.  Before he was brought to the United States by Respondent in July 2014, he had only attended school in Mexico, and spent most of his eight-year life in Mexico. Except for his father and two uncles, who currently reside in the United States, J.G.V.'s entire family, including his stepmother with whom he has a close relationship, lives in Mexico, where Petitioner and Respondent were raised and spent most of their lives before coming to the United States in 2005.  Petitioner testified that, when she moved back to Mexico with J.G.V. in 2007 to be close to her family, Respondent understood that she did not intend to return to the United States, and he was "okay with that," as long as he could continue to see J.G.V. and spend time with him in Acapulco, Mexico.  While Respondent indicated that he would rather Petitioner live in the United States, it was only after she moved from Acapulco, away from his family to other cities in Mexico, that he objected to Petitioner's choice of residence.  Moreover, the court reasonably infers that Respondent's desire to have Petitioner live in the United States or Acapulco is driven more by his desire to control Petitioner by keeping her and J.G.V. close to him and his family than an intention to make the United States J.G.V.'s habitual residence.

Respondent emphasizes that Petitioner moved several times within Mexico after returning to Mexico and contends that Dallas, Texas, or the United States, rather than Mexico, is J.G.V.'s habitual residence.  Respondent apparently misunderstands the meaning of habitual residence. Petitioner's moves within Mexico do not undercut or undermine her assertion that Mexico is J.G.V.'s habitual residence, as Petitioner did not leave Mexico to live in some other country

permanently.  All of the various moves were either within Acapulco, Mexico, or to other cities in Mexico, and there is no evidence that the parties ever intended Dallas, Texas, or the United States to be J.G.V.'s habitual residence.  Further, while Petitioner returned with J.G.V. to the United States twice for medical treatment and a birthday party, she did so only for a short time without any intention of staying longer than was necessary.  Additionally, after leaving the United States in 2007, Petitioner never wavered regarding her earlier decision to remain permanently in Mexico with J.G.V.

Finally, while the parties' custody agreement that gives Petitioner the exclusive right to determine J.G.V.'s residence is not synonymous with habitual residence as that term is used in the Convention, it is consistent with the parties' verbal agreement and understanding that J.G.V. would continue to attend school and live with his mother in Mexico and spend time with Respondent in Acapulco during vacations and other agreed-upon times.  It is also consistent with the parties' conduct in acting in accordance with this understanding and agreed-upon arrangement prior to July 2014.

Based on the foregoing, the court therefore determines that Petitioner and Respondent shared an intent or settled purpose that J.G.V.'s habitual residence would be Mexico.  *See Larbie*, 690 F.3d at 310.  Respondent's removal of J.G.V. from Mexico and retention of him in the United States without Petitioner's consent, and his filing of a state action in August 2014 to modify the parties' custody agreement after bringing J.G.V. to the United States does not affect the court's resolution of this issue because Respondent's unilateral actions in this regard are insufficient to establish an intent to change J.G.V.'s habitual residence.  *Id.* at 310-11.  Moreover, as herein discussed, there is no credible evidence to support Respondent's exaggerated allegations of abuse and illegal conduct—the purported bases for the requested custody modification. For all of these reasons, the

**Memorandum Opinion and Order - Page 39**

court concludes that J.G.V.'s habitual residence is Mexico.  Petitioner has therefore satisfied this element.

### 2.      Wrongful Removal or Retention

The Divorce Decree sets forth the terms of the parties' custody agreement and the parameters for each party's rights of possession with respect to J.G.V.  Respondent's decision to retain possession of J.G.V. beyond the time allowed by the custody agreement for summer visitations and his removal of J.G.V. to the United States without Petitioner's consent or knowledge and refusal to return him to Mexico were clear violations of the Divorce Decree, custody agreement's visitation provisions, and Petitioner's right to designate J.G.V.'s residence.  Respondent's removal and retention of J.G.V. were therefore wrongful.  Moreover, while the custody agreement gives Respondent the duty to protect J.G.V., it does not justify his unilateral decision to retain possession of J.G.V. and bring him to the United States in violation of the custody agreement, based on nothing more than an unsubstantiated concern regarding J.G.V.'s apprehension of the bathroom.  If Respondent wished to modify the custody agreement with Petitioner, he should have initiated such proceedings and obtained a court ruling beforehand, instead of taking matters into his own hands. The court, therefore, concludes that Petitioner has satisfied this element.

### 3.      Petitioner's Exercise of Custody Rights

The evidence shows that Petitioner was exercising her custody rights under the Divorce Decree by designating Mexico as J.G.V.'s residence, enrolling him in school in Mexico, and attending to his everyday needs.  At all times prior to July 2014, J.G.V. resided with Petitioner and was in her custody, except when Respondent exercised his visitation rights under the parties' earlier verbal agreement or the 2012 written custody agreement.  To ensure that she could continue to

**Memorandum Opinion and Order - Page 40**

communicate with J.G.V., Petitioner purchased and gave him a cellular telephone before he went

on vacation with Respondent in July 2014.  After learning that Respondent did not intend to return

J.G.V. on the agreed-upon date in July 2014, Petitioner pleaded for his return and called as much as

twenty times a day on some occasions in an attempt to communicate with Respondent and J.G.V.

Petitioner continued to call even after Respondent stopped answering her calls and refused to allow

J.G.V. to answer the cellular telephone that she purchased for him.   Petitioner filed a criminal

complaint against Respondent and initiated wrongful removal proceedings in Mexico and the United

States.  Petitioner refused to waive her right to receive citation and service without an explanation

of what she was being requested to waive in the Texas custody suit filed by Respondent.  Petitioner

also traveled from Mexico to attend the two-day bench trial in this case.  Simply put, there is no

evidence that Petitioner was not exercising her "rights of custody," as that term is defined by the

Convention, when Respondent wrongfully retained possession of J.G.V. and brought him to the

United States.  *See Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)).  Likewise, there is no

credible evidence that  Petitioner "consented to or subsequently acquiesced in the removal or

retention."  Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

Contrary to Respondent's contention, the inclusion of two last known addresses for

Respondent in Petitioner's criminal and civil filings is not evidence that Petitioner was not exercising

her rights of custody or that she acquiesced in Respondent's removal and retention of J.G.V. in

violation of the parties' custody agreement.  Moreover, Petitioner explained that, while she thought

Respondent was residing in Dallas, Texas, prior to J.G.V.'s retention and removal from Mexico, she

was not certain whether Respondent took J.G.V. to Dallas, Texas, and she was unsure whether

Respondent was residing at either of the two addresses she provided in the forms that she completed

and filed.  Accordingly, Petitioner has satisfied this final element and her burden of establishing, by a preponderance of the evidence, that the removal or retention of J.G.V. was wrongful.  The burden, therefore, shifts to Respondent to prove one of his narrow affirmative defenses.

**B.  Respondent's Affirmative Defenses**

In his answer to the Petition, Respondent alleged affirmative defenses based on Petitioner's alleged failure to exercise her custody rights; Petitioner's consent or acquiescence to J.G.V.'s removal or retention; human rights and fundamental freedom violations; grave risk; and mature child.  During the bench trial, however, Respondent indicated more than once that he only had two affirmative defenses and was only proceeding on his grave risk and mature child defenses.  The court, therefore, concludes that Respondent has abandoned the other defenses alleged in his Answer and only addresses the grave risk and mature child defenses.[12]

**1.  Grave Risk**

Respondent relies solely on Ms. Garcia's testimony and records to support his contention that J.G.V. would be subjected to grave risk of physical or psychological harm or an intolerable situation if returned to Mexico.  Ms. Garcia opined that *if* J.G.V. were returned to Mexico, and *if* he were subjected to the same or similar trauma at the hands of his stepfather, he would suffer physical and psychological harm.  Ms. Garcia, however, admitted that she could not predict the future.  While no person can predict the future, Ms. Garcia does not provide an adequate basis for the court to make a reasonable inference that J.G.V. is likely to suffer harm if his is returned to Mexico.  Additionally, for the reasons previously explained, the court determined that Ms. Garcia's opinions regarding

---

[12] Even assuming that Respondent did not intend to abandon these defenses, he presented no evidence at trial to support the defenses, and, therefore, the evidence in this case is insufficient to establish any of the defenses.

J.G.V.'s diagnosis and treatment, including her opinion that J.G.V. suffered physical and psychological harm at the hands of his stepfather, are based on incomplete facts and unreliable or unclear principles and methodology.

Moreover, J.G.V.'s various reports to Ms. Garcia and the court of alleged abuse and other key events are inconsistent or lacking in detail.  There is no credible evidence to support Respondent's contention that J.G.V. was locked in a bathroom for thirty or more days; nor is there any support for Ms. Garcia's assumption that J.G.V. was locked in a bathroom for several days. When asked by the court, J.G.V. was unable to articulate how long he spent in the bathroom, and his unemotional response that he was only let out to eat and go to school appeared to be rehearsed. Unlike Ms. Garcia, Petitioner had first-hand knowledge of how J.G.V. was disciplined for bad behavior with thirty-minute time-outs in the bathroom, and her testimony was the only credible evidence regarding this matter.  While Ms. Garcia expressed the opinion that children should not be put in a time-out for more than one minute for each year of the child's age, her testimony in this regard was far from sufficient to meet Respondent's heavy burden of establishing, by clear and convincing evidence, that J.G.V. will be subjected to the type of grave risk of physical or psychological harm contemplated by the Convention if returned to Mexico.

Respondent's decision to wait five months until January 2015 before seeking counseling for J.G.V. in the United States further seriously undermines his claim that J.G.V. was subjected to grave risk of harm as a result of being put in the bathroom.  Respondent attempted to paint a story of being concerned about J.G.V.'s anxiety and left the court with the impression that time was of the essence. When asked by the court why he waited so long to take J.G.V. to a counselor, Respondent testified that he requested counseling for J.G.V. through his school in Dallas because of his concern about

J.G.V.'s anxiety problem, but that the appointments provided to him for the counseling referrals were set far in the future.  Respondent went on to explain that this is when the conflict with the other boy at school occurred, and it was for this reason that J.G.V. was referred to therapy at that time. Regardless of whether J.G.V. was referred for counseling in late December or early January 2015 due to the conflict at school with another boy, this still does not explain why, given Respondent's alleged concern, he chose to wait and go through the school counselor instead of seeking out and taking J.G.V. for private counseling long before the incident at school occurred, as he allegedly did in Mexico in July 2014.

Respondent's actions and efforts to obtain counseling for J.G.V. upon returning to the United States are not consistent with a parent who is genuinely concerned about the welfare of his child. Respondent appears to have made a concerted effort to quickly file suit in state court to modify the parties' custody agreement but did not act with the same urgency in obtaining counseling for J.G.V. Moreover, while Respondent explained that J.G.V. was referred to Ms. Garcia by the school counselor, Ms. Garcia testified that Respondent found her on the Internet. No credible explanation was given by Respondent for the inconsistency between his and Ms. Garcia's testimony on this topic.

This inconsistency, combined with Respondent's inadequate explanation for why he delayed several months before taking J.G.V. to counseling; his inability to recall details about the therapist in Mexico;[13] and his inability to recall basic information like the name of the school counselor in the

---

[13] After Mr. Vega testified that he could not recall the name of the therapist in Mexico, his attorney Mr. Cortez advised the court, "We do know the identify of the psychologist in Mexico." It is unclear what Mr. Cortez meant by "We." As previously noted, Respondent was unable to recall much if anything about the therapist in Mexico or J.G.V.'s alleged sessions with her.  Mr. Cortez added that no evidence regarding this therapist's session(s) with J.G.V. was presented because Respondent was unable to contact the therapist and obtain her records. Mr. Cortez further stated that if the court could undertake an independent investigation, he could provide information to the court for this purpose. By this, Mr. Cortez presumably meant that he could provide the therapist's name and contact information.  In response, Petitioner objected to the admission of any such posttrial extraneous evidence and further investigation.  Petitioner also

**Memorandum Opinion and Order - Page 44**

United States, seriously undermines his credibility and testimony.  Respondent attempted to explain away his inability to recall the name of the school counselor, whom he had talked to a number of times, on his speaking to her through an interpreter.  Respondent, however, presumably spoke without an interpreter to the therapist that J.G.V. allegedly saw in Mexico, and this did not help his memory in recalling the therapist's name, how much he paid for her services, or the therapist's contact information.  Respondent could not even say for sure how many times he took J.G.V. to see the therapist in Mexico.

Similarly, the only evidence that J.G.V. was struck or hit one time on the face by his father with sufficient force to cause a bruise on his face or to give him a busted lip is J.G.V.'s inconsistent reports of the alleged incident to Ms. Garcia and the court.  Notably, there is no physical evidence in the form of school reports or verbal reports by his father to others to substantiate J.G.V.'s statements that he sustained either a bruise or busted lip before going on vacation with his father or while attending school in Mexico.

Additionally, Petitioner unequivocally testified that no such thing ever happened.  While no cause for approbation, that Petitioner or her husband may have struck or spanked J.G.V. on one or two occasions in the past to correct his misbehavior does not support Respondent's claim that J.G.V. has been or will be subjected to grave risk of physical or psychological harm or an intolerable situation if returned to Mexico.  Even assuming that the slap occurred, it falls woefully short of providing the court with a basis to conclude that J.G.V. would be subject to a grave risk of harm if

---

objected to Mr. Cortez testifying.  The court **sustains** Petitioner's objections to Mr. Cortez's commentary.  It is not incumbent on the court to conduct independent investigations or gather evidence to support the parties' claims and defenses.  Moreover, Respondent was aware of the existence of this alleged evidence for almost one year and had more than sufficient time before the trial of this case to investigate, prepare a defense, and obtain whatever evidence he needed for the hearing regarding the alleged therapist in Mexico.

returned to Mexico to the custody of his mother. The limited information that J.G.V. shared with Ms. Garcia regarding alleged name-calling and verbal "put-downs" by his stepfather are likewise insufficient to support a grave risk an intolerable situation finding by the court or Ms. Garcia's conclusion that J.G.V. was psychologically abused.

The only other evidence presented in support of Respondent's grave risk defense is the 2012 kidnapping.   It is undisputed that the kidnapping occurred in 2012, and Petitioner's and J.G.V.'s accounts of the kidnapping are consistent.   Ms. Garcia attributed J.G.V.'s hyper vigilance, anxiety, and nightmares in large part to the kidnapping.   There is no evidence, however, that Petitioner or her husband were in any way responsible for the kidnapping.   There is also no evidence to show that there is a likelihood that J.G.V. and his mother will be the victims of kidnapping in the future if he is returned to Mexico.   In other words, Respondent presented no evidence to show that this was anything more than an isolated random event that was beyond the control of Petitioner and her husband.   Further, there is no evidence to support Respondent's allegation that Petitioner or her husband has engaged in illegal activity, and Petitioner provided plausible explanations for why she moved several times within Mexico after returning in 2007.   She also explained that her husband's current work in security requires him to drive and maintain bulletproof vehicles.   Accordingly, the court concludes that neither the 2012 kidnapping nor the other grounds relied on by Respondent constitute clear and convincing evidence that J.G.V. will be subjected to a grave risk of harm or placed in an intolerable situation if returned to Mexico where he has lived most of his life.   The facts

of this case simply do not rise to the level of graveness or seriousness required to support a grave risk defense under the Convention.[14]

### 2.    Mature Child

Respondent appears to proceed on the assumption that the court's in camera interview of J.G.V. would support his mature child defense.  For the reasons already explained, the court concludes, from its interview of J.G.V. and the manner in which he conveyed certain information to Ms. Garcia, that it would not be appropriate to consider J.G.V.'s views in determining whether he should be returned to Mexico, as J.G.V. has not attained an age and degree of maturity at which it is appropriate for the court to consider or take into account his views as to whether he should remain in the United States.  As previously noted, there were material inconsistencies in J.G.V's reported accounts of events, and the manner in which he responded to various questions indicated to the court that he does not have a firm grasp of time and space relationships.  His accounts of time-related events varied in detail and consistency and in some instances appeared exaggerated.  For example, he was unable to articulate to the court or Ms. Garcia or provide an estimate of how long he was required to stay in the bathroom for time-outs, even though Respondent and Ms. Garcia believed that the time-outs caused him to suffer a tremendous degree of anxiety.  On the other hand, he indicated without hesitation that he was once required by his mother or stepfather to remain on

---

[14] Courts that have dealt with allegations of abuse and refused to order the return of children typically involve life-threatening abusive situations that are far more grave than the isolated slap(s) and time-outs at issue in this case. *See, e.g., Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing order of return where the father had "beat[en] his wife severely and repeatedly in [the children's] presence," and threatened to kill them); *Walsh v. Walsh*, 221 F.3d 204, 219-20 (1st Cir. 2000) (reversing order of return where father was psychologically abusive and had severely beaten the children's mother in their presence); *Allusive v. Allusive*, 353 F. Supp. 2d 394, 398-400 (E.D.N.Y. 2005) (refusing return where father frequently hit the children, threatened to kill his son, and severely abused their mother in their presence); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (refusing return where child had been belt-whipped, punched, and kicked, and where the child's mother had been subjected to more serious attacks, including choking and breaking of her nose).

the balcony for a few minutes for misbehaving.  In addition, J.G.V. described to the court something that his younger half-sister did some time ago to annoy him as if it happened yesterday.  He also expressed an exaggerated fear of being required to stay in any confined space where there might be spiders.

Some of J.G.V.'s responses to the court's questions also appeared to be rehearsed or mechanically repeated without any emotion.  From this and his statements about his conversations with Respondent and Respondent's family, and his mentioning that he recently watched a television program involving the custody of a child, the court was left with the impression that he had been influenced by Respondent and Respondent's family.  The court also found J.G.V.'s explanation of the difference between the truth and a lie to be immature,[15] and it was obvious to the court that he did not understand the purpose of this litigation.  Thus, although J.G.V. expressed his desire to remain in the United States, the court does not consider his views and concludes that Respondent has not satisfied his burden with respect to the mature child defense.  In making this determination, the court, during the course of its questioning J.G.V. took into account the child's facial expressions, some of which were quizzical, as well as his body movements, posture, speech pattern, and pauses in answering questions. That J.G.V. was speaking through an interpreter did not affect the court's ability to assess his demeanor and level of maturity.

Accordingly, ordering the return of J.G.V. to Mexico and the custody Petitioner is not only mandatory under the Convention and ICARA , but it is also warranted under the circumstances of this case.

---

[15] J.G.V's statement that a lie will eventually be revealed or come to light is obviously something he heard from an adult or mature person, and he was simply repeating what he heard to the best of his recollection; however, the statement is helpful in convincing the court that J.G.V. does not have the requisite level of maturity for the court to consider his views in determining whether he should be returned to Mexico.

**Memorandum Opinion and Order - Page 48**

## V.      Request for Fees and Costs

Petitioner has requested to recover her attorney's fees and costs incurred as a result of this action but has not, to date, submitted proof of the legal fees or costs she incurred.  Regarding the recovery of fees and costs in wrongful removal and retention proceedings under the Convention and ICARA, article 26 of the Convention states that the court "may, where appropriate" order the removing parent to cover all legal and travel expenses of the nonremoving party.  *See* Convention, art. 26; *Sealed Appellant*, 394 F.3d at 346.  ICARA, on the other hand, requires the court to order the removing parent to pay fees and costs incurred by the petitioner if it finds in favor of the petitioner and orders the return of the child:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall order* the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3) (emphasis added) (formerly 42 U.S.C. § 11607); *Sealed Appellant*, 394 F.3d 346.

The court **believes** that Petitioner is entitled to recover against Respondent all reasonable and necessary attorney's fees and expenses pursuant to 22 U.S.C. § 9007(b)(3); however, the court cannot make a final determination on the issue of attorney's fees and expenses, as the parties have not fully briefed this matter.  Accordingly, Petitioner shall file within **14 days** of this Memorandum Opinion and Order, an application detailing the services rendered and expenses incurred and supporting authority for and documentation of all fees and costs requested.  *See* Fed. R. Civ. P. 54(d)(2)(B)(i).  Any objections or response by Respondent must be filed within **14 days** from the date of service of Petitioner's submission.  Petitioner may file a reply within **7 days** from the date

of service of Respondent's objections or response.  Unless Respondent is able to establish that the requested award is "clearly inappropriate," the court will enter an appropriate monetary award of attorney's fees and expenses.

## VI.   Conclusion

For the reasons herein stated, the court **grants** the Petition for Return of Child to Petitioner and **orders** that the child, J.G.V., be **returned** forthwith to Mexico to the custody of his mother, Petitioner Berenice Vega Ostos, at the conclusion of the final hearing conducted by the court on June 10, 2015.  The court *orders* that Respondent Jose Alfredo Vega immediately release and surrender J.G.V. to Petitioner.  *Further, neither Respondent nor anyone on his behalf shall take any action to interfere or thwart this court's order.  If any person interferes with the court's directives herein, such person will be subject to the imposition of severe sanctions, including, but not limited to, arrest and incarceration for contempt of court.*

The court **retains** jurisdiction over this matter pending J.G.V.'s return to Mexico to the custody of Petitioner and the resolution of any motion for attorney's fees and costs.  Judgment will issue by separate document as required  by Federal Rule of Civil Procedure 58.

**It is so ordered** this 10th day of June, 2015.


_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order - Page 50**